IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JASON WALTER LOVISON, ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | No. 3:14-cv-1517-P |
| | § | |
| PATRICK LANGHAM GLEASON, M.D., | § | |
| ET AL., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Jason Walter Lovison and Darlene Lovison (collectively, "Plaintiffs") have filed a Motion for Sanctions for Witness/Party Intimidation against Defendants Patrick Langham Gleason, M.D. and Norcentex Neocortex, PLLC (collectively, "Defendants"). *See* Dkt. No. 31. Chief Judge Jorge A. Solis has referred the motion to the undersigned United States magistrate judge for determination, pursuant to 28 U.S.C. § 636(b) and an order of reference. *See* Dkt. No. 25. Defendants have filed a response, *see* Dkt. No. 34, and Plaintiffs have filed a reply, *see* Dkt. No. 35.

For the reasons explained below, the Court DENIES Plaintiffs' Motion for Sanctions for Witness/Party Intimidation [Dkt. No. 31]. *See generally Brown v. Bridges*, No. 3:12-cv-4947-P, 2015 WL 410062, at *1-*4 (N.D. Tex. Jan. 30, 2015) (explaining that, when a district judge refers a motion for sanctions to a magistrate judge, the sanction chosen by the magistrate judge, rather than the sanction sought by the party, governs the determination of whether Federal Rule of Civil Procedure 72(a) or 72(b)

applies and that, when the magistrate judge finds that dismissal or another sanction disposing of a claim or defense in unwarranted, the motions should be characterized as non-dispositive and may be ruled on by the magistrate judge).

## Background

The following facts are undisputed.

Plaintiff filed this medical liability action alleging that Dr. Gleason was negligent in performing spinal surgery on Plaintiff on April 27, 2012. *See* Dkt. No. 1.

Plaintiff disclosed treating physician Joel Hoekema, M.D. as an expert witness on August 19, 2014. *See* Dkt. No. 19 at 2.

In February 2015, Plaintiffs' counsel received a letter dated February 17, 2015 from a lawyer named Michael Sacopulos of Sacopulos, Johnson & Sacopulos in Terre Haute, Indiana. *See* Dkt. No. 31-2 at 4 of 74. The letter states as follows:

> Please be advised that I represent Medical Justice®. Further be advised that Dr. Langham Gleason is a Plan Member for Medical Justice Services, Inc. Medical Justice® pays the expenses up to $100,000.00 to bring claims against proponents of nonmeritorious medical malpractice suits.
>
> The system is designed to discourage the use of expert witnesses who deliver deceptive or false testimony; particularly when they are outside the scope of their training and/or field of specialty. The system also addresses baseless claims advanced against peripheral defendants. The remedies can be pursued in legal or extralegal venues. The system uses independent third party attorney/medical experts to screen cases and the testimonial record that qualify for claim prosecution.
>
> Medical Justice® is not designed to thwart attempts of Plaintiffs seeking redress for legitimate complaints. On the contrary, Medical Justice® is designed to assist in supporting a level of integrity for the overall medical malpractice venue. Medical Justice® is merely the funding agent for remedies already available to physicians in legal and extralegal venues. More information about Medical Justice® may be found at its web site at www.medicaljustice.com.

*Id.*

Plaintiffs deposed Dr. Gleason on May 22, 2015. He testified, under questioning by Plaintiffs' counsel, about this letter and related matters in pertinent part as follows:

> Q. Okay. Do you – do you understand or have an appreciation why Sergeant Lovison is upset that a device was used that was not FDA approved without his knowledge?
>
>     MS. SVATEK: Objection; form.
> A. No, I do not.
> Q. (BY MR. GIRARDS) Okay. Why not? Why can't
> you understand –
> A. I don't believe that the device in any way has contributed to his outcome. I think that – as I said earlier, it's very common to do a lumbar microdiskectomy and have patients not improve or improve for a while and develop scar tissue. It's not an unusual or mysterious outcome in lumbar disk surgery.
> Q. Uh-huh. Do you – I take it, then, you think that the lawsuit that he has filed against you is non-meritorious?
> A. That's correct.
> Q. Do you think it's frivolous?
> A. Yes.
>     MS. SVATEK: Objection; form.
> Q. (BY MR. GIRARDS) The basis for your belief that it's frivolous is because you do not think that there are any problems associated with the tension bands –
> MS. SVATEK: Objection; form.
> Q. (BY MR. GIRARDS) – that were used in his
> spinal surgery?
>     MS. SVATEK: Objection; form.
> A. Most of all, the basis is that less-than-good or outright bad outcomes are common enough in lumbar disk surgery that it's not something that anything or anyone, in this case or in most cases, can be blamed for. It's something that I spend time talking to patients about pre-operatively explaining that there's no guarantee that the surgery will help.
>                     ....
>                 (Exhibit No. 9 marked.)
> Q. (BY MR. GIRARDS) Let me show you what I've marked as Exhibit No. 9. Have you ever seen that before?
> A. No, I have not seen this.
> Q. Do you know who these folks are?

A. I'm familiar with the company, Medical Justice, yes.

Q. How are you familiar with Medical Justice?

A. I am a member of the organization, paying dues annually to, in essence, prepay for legal counsel and in cases of lawsuits.

Q. When did you become a member of Medical Justice first?

A. I believe it was 2013.

Q. Okay. And why did you do that? Tell me every reason why you decided to become a member of Medical Justice.

     MS. SVATEK: Objection; form.

A. In order to have some recourse in cases of non-meritorious malpractice suits other than sitting through the whole process of discovery and the depositions and trial, if necessary.

Q. (BY MR. GIRARDS) Medical Justice is not defending you in the lawsuit. You have – you have your own attorney for that; correct?

A. Correct.

Q. Medical Justice is – well, go ahead and read – read the first [para]graph of that letter.

A. Yeah. They go after, you know, expert witnesses that are – are unethical in their involvement in testimony.

Q. And so the letter that you've got there, Exhibit 9, is a letter that Medical Justice sent basically to Sergeant Lovison through my office?

     MS. SVATEK: Objection –

Q. (BY MR. GIRARDS) Is that what it appears to be?

MS. SVATEK: Objection; form.

A. I don't see Sergeant Lovison's name as the addressee but –

Q. (BY MR. GIRARDS) Well, it's addressed to me; isn't it?

A. Yes.

Q. Certified mail?

A. Yes.

Q. And it references you?

A. Correct.

Q. And you have the one and only lawsuit that we're involved with together?

A. Correct. I'm just saying this letter is to you. It's not to Sergeant Lovison.

Q. And you have no doubt that it –

A. Yeah, it's referring to this suit, yes.

Q. Okay. It says they've got a hundred thousand dollars that they're going to use to come after the filers of non-meritorious lawsuits; right?

A. Correct.

Q. And so what is the – what's the purpose of them sending this letter?

     MS. SVATEK: Objection; form.

A. I would – I would have you ask them that.

Q. (BY MR. GIRARDS) But you signed up to be a member and pay them money every year; right?

A. Correct.

Q. And one of the reasons you did that is because of the service they offer; right?

A. Correct.

Q. And the service they offer is what exactly?

A. I believe I already stated that service.

(Exhibit No. 10 marked.)

Q. (BY MR. GIRARDS) Let me show you what's marked Exhibit No. 10. Go ahead and hold that up to the camera and tell us – tell us what that is.

A. It is a four-page document by Attorney Dr. Jeffrey Segal and Attorney Michael Sacopulos about do-it-yourself tort reform focused on medical experts.

Q. Okay. And Sacopulos, that sounds familiar. Is that the guy who signed that letter to me?

A. Yes.

Q. Okay. And this article that he wrote, did you see that before you signed up with Medical Justice?

A. I don't think I did. I don't recognize it, but I recognize the concept of the title.

Q. The concept is that they would intimidate expert witnesses into not testifying in lawsuits that they believe were non-meritorious.

A. I don't think intimidate is the right term.

Q. Well, if you look in Exhibit No. 10, they actually talk about witness intimidation. Go ahead and look at that.

A. I'm sorry, you said Exhibit 10? Oh, in this document.

Q. Yeah.

A. I thought you wanted me to dig down into something else. (Witness reviews document.) It does talk about intimidation, but it says that witness intimidation in the strict legal sense addresses criminal matters.

Q. Uh-huh.

A. Which this isn't.

Q. Yeah. So they kind of tiptoe around witness intimidation, but what they describe in there is very clearly witness intimidation in a civil context; don't you think?

MS. SVATEK: Objection; form.

A. I haven't studied this document. I don't have an opinion.

Q. (BY MR. GIRARDS) Well, isn't that the purpose of your signing up for Medical Justice, so that they would have a hundred thousand dollars reserved to pursue Jason Lovison's expert witness, for example?

A. If he is testifying outside of the standard of care, if he is claiming that

something is the standard of care when it's not or claiming that something that was done isn't the standard of care when it is.

Q. So getting back to Exhibit No. 9, the purpose of that letter is to inform me and I guess my client and my expert witness is that there's a hundred thousand dollars that's going to be used to pursue Jason's expert witness.

      MS. SVATEK: Objection; form.

Q. (BY MR. GIRARDS) Isn't that what Exhibit 9 is –

A. Again, I wouldn't –

Q. – in essence –

A. – I would direct you to the Medical Justice company to get a more detailed interpretation of this letter.

Q. That – that's one of the benefits that you signed up for is they would have that hundred thousand dollars and they would send letters like this; correct?

A. The benefit is to prevent expert witnesses who are claiming that the standard of care was breached when it wasn't or claiming that the standard of care wasn't followed when it was, to prevent those expert witnesses from continuing their work across America.

Q. So do you – you endorse that letter, Exhibit No. 9?

A. I welcome an expert witness who is honest and speaks to the standard of care for spine surgery in Texas in 2010 with respect to this case.

Q. And so getting back to that Exhibit No. 9 letter, it's one thing to have a hundred thousand dollars available to pursue whatever recourse that you want to pursue but it's quite another thing to send that letter during a pending Federal lawsuit.

A. I, again, would direct you the attorneys at Medical Justice to discuss that or to find out more about what that means to them or you.

Q. So you're saying you don't know why the letter that's marked as Exhibit No. 9 was sent to me?

A. I believe I just said I don't know why.

Q. Okay. Do you have any idea what it means to attempt to intimidate a witness in a Federal proceeding?

A. No, I'm –

      MS. SVATEK: Objection.

A. – not an attorney.

Q. (BY MR. GIRARDS) So do you have a file on Medical Justice?

A. Yes.

Q. Do you have correspondence with them?

A. Just related mainly to membership and – and factual reporting of this case.

Q. Right. It's not – it's not correspondence that's for the purpose of defending the merits of a medical liability case. That's what Ms. Svatek's law firm is doing?

A. Correct.
Q. Would it be difficult for you to take that file and send a copy to Ms. Svatek so that I can follow up with her later?
A. It would not be difficult.
Q. Okay. I would ask you to do that, and I will follow up with Svatek on that.
A. I would leave that up to her whether that's appropriate.
Q. Sure. I would expect you to. All right. Is it – is it your intention to take that hundred thousand dollars and pursue a claim or complaint or lawsuit against any of Jason Lovison's experts in this lawsuit?
    MS. SVATEK: Objection; form.
A. If they testify falsely about the standard of care, yes.
Q. (BY MR. GIRARDS) Okay. Do you think that if they testify that a non-FDA approved device shouldn't be used on a patient without the disclosure being made to the patient, do you think that is unreasonable?
    MS. SVATEK: Objection; form.
A. I don't believe that applies in this case.

*Id.* at 5-20 of 74; *see also id.* at 21-24 of 74 (Exhibit 10 discussed above).

Based on the letter and Dr. Gleason's testimony, along with a few, apparently publicly available articles or other written materials about or published by Medical Justice Services, Inc., Plaintiffs then filed a Motion for Sanctions for Witness/Party Intimidation, asserting that "Defendants have illegally attempted to coerce or intimidate Plaintiffs, their expert witness, and undersigned counsel in this case in order to have expert witness Dr. Hoekema withdraw or change his testimony or cause the lawsuit to be dropped altogether" and that, "[f]or this illegal conduct, Plaintiffs ask that Defendants be sanctioned up to and including striking their pleadings." Dkt. No. 31 at 1. Plaintiffs further explain:

    Michael Sacopulos is general counsel of Medical Justice, a company founded by Jeffrey Segal, MD a physician who started the company to exact his own personal form of "tort reform" on those bold enough to sue a physician, by disciplining Plaintiffs and their counsel and expert witnesses through lawsuits/counterclaims/complaints to professional

societies in attempt to get expert witnesses to withdraw from the cases or the cases to be dropped altogether. Originally, Segal, et al., crafted a plan to exercise frank witness intimidation/coercion while claiming publicly to only seek to eliminate "frivolous" lawsuits supported by "guns-for-hire" expert witnesses. Segal even had the idea patented. However, since that time Medical Justice has moved its target from "frivolous" lawsuits to all "nonmeritorious" cases – defined as any lawsuit or claim that terminates in favor of the Medical Justice client. The contract reads: "'Termination in favor of the Plan Member' means that (a) *the patient (or representative) received no recovery from the malpractice claim or lawsuit; (b) the Plan Member prevailed on the merits; and (c) court or arbitration forum found and concluded Plan Member had no liability."* Thus, no matter the merits of the underlying case, in the event the outcome is such that no money is paid or a defense verdict results, Medical Justice will pursue undersigned counsel, Plaintiffs and Joel Hoekema, MD with lawsuits/counterclaims, and complaints to medical societies, with $100,000 financial backing to support the effort. As the court may know, meritorious lawsuits can result in no compensation being paid or a defense verdict for many reasons unrelated to the merits of the lawsuit. In a venue in which 92% of medical malpractice lawsuits result in a defense verdict, raising the risks of a trial loss in this manner is substantial. The threat is real.

Putting the letter together with the Medical Justice website and the articles published by the principals of Medical Justice, it is clear that the letter was sent to undersigned counsel for the purpose of intimidating Joel Hoekema, MD to withhold his testimony, back out of the lawsuit, or have Plaintiffs drop the lawsuit outright regardless of the merits of the case for fear of being bankrupted should the case not turn out favorably. Making threats of this nature shakes the very core of our civil justice system and the integrity of the federal court system. The Court should address this is in a strongest possible terms.

Dkt. No. 32 at 2-3 (emphasis in original; footnotes omitted).

Citing the federal criminal statute prohibiting intimidation of witnesses, 18 U.S.C. § 1512(b), and the Court's inherent powers, Plaintiffs assert that "Medical Justice and its principals have made an industry of witness intimidation for over a decade and have expanded their targets from what they describe as 'frivolous' lawsuits to cases that simply lose at trial by coercing parties and witnesses into changing or

withholding testimony [in the case of expert witnesses] to dropping otherwise meritorious claims for fear of financial catastrophe if the outcome is bad"; that "Defendant Gleason has chosen to enlist these services and has endorsed them in his sworn testimony"; that, "[f]or now, the Medical Justice threat includes $100,000 in funding of counterclaims and other efforts in both 'legal and extralegal' venues"; that "[t]he court system should not wait until the purse is increased to $1,000,000 or more and personal ruin is guaranteed in the event of a trial loss for all participants on the Plaintiffs' side"; and that "[a]n example must be made of Defendants and Medical Justice to not only stop such tactics dead in their tracks but to prevent others who would pick up the banner and advance it in the future through tactics that are abusive at best and frankly illegal at worst." *Id.* at 4-5; *see also* 18 U.S.C. § 1512(b) ("Whoever knowingly uses intimidation… or attempts to do so… with intent to – (1) influence, delay, or prevent the testimony of any person in an official proceeding; [or] (2) cause or induce any person to – (A) withhold testimony ... shall be fined under this title or imprisoned not more than 20 years, or both.").

Through their motion for sanctions, "Plaintiffs request the court sanction Defendant Gleason in an appropriate amount to punish this conduct and deter others in the future in an amount up to and including striking of Defendants' pleadings." *Id.* at 5.

Defendants respond that "Plaintiffs' motion is wholly without merit and does not justify a 'death penalty' sanction as no such intimidation or threat has occurred." Dkt. No. 34 at 1. Defendants contend that, "[o]n February 17, 2015, Michael Sacopulos sent

Mr. Jim Girards, counsel for Plaintiffs, a letter regarding his representation of Medical Justice – *not Dr. Gleason* – and informing Mr. Girards of Medical Justice's purpose to discourage the use of expert witnesses who deliver deceptive or false testimony"; that "[n]owhere in this letter is there mention of any alleged expert used or retained by Plaintiffs, the alleged expert's qualifications, or a claim that false or deceptive testimony has occurred"; that "there is also no mention that Medical Justice has contacted Plaintiffs' alleged expert, knew the identity of this alleged expert, or made any threat to this potential expert at any time"; that "Medical Justice has never claimed, and did not claim to Plaintiffs' counsel, that all cases ending in Defendants' favor lack merit"; that "Medical Justice uses outside medical experts to independently evaluate the merits of a claim *post-litigation*, which has been lawfully recognized by United Stated Federal Courts"; and that, "[b]ecause Defendants in no way intimidated, threatened, or even attempted to intimidate or threaten Plaintiffs' alleged experts, Defendants cannot be punished." *Id.* at 2 (emphasis in original).

Defendants assert that, "[h]ere, not only have Defendants not acted in bad faith, but it is clear from Dr. Gleason's cited deposition testimony in Plaintiffs' motion as well as in the letter sent to Mr. Girards by Medical Justice that no bad faith can even be inferred"; that "[t]here is no evidence that Plaintiffs' alleged expert has any knowledge of Medical Justice or Dr. Gleason's membership that would hinder his testimony"; that "[t]here is no evidence that Defendants or Medical Justice have ever, or is now, intimidating any witness or party to litigation"; that "[t]o discourage the use of expert witnesses who deliver deceptive or false testimony is not an act of bad faith or an

attempt to intimidate a witness"; and that, "[i]nstead, Medical Justice and other organizations or professional societies intend to support the truthful and ethical testimony in medical malpractice cases, where the information and medical knowledge necessary to properly litigate such a claim can require highly technical and skilled knowledge. *Id.* at 3.

Defendants further argue that 18 U.S.C § 1512(e) allows truth-seeking conduct to be a defense to any charge of witness tampering and that the United States Courts of Appeals for the Fifth and Seventh Circuits allow professional organizations to screen expert witness testimony. *See id.* at 4-5; *see also* 18 U.S.C. § 1512(e) ("In a prosecution for an offense under this section, it is an affirmative defense … that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully.").

Defendants finally contend that, "[f]or witness tampering or intimidation to occur, a witness must be identified and contacted"; that "Defendants, Defendants' counsel, or Medical Justice never contacted Plaintiffs' alleged expert – directly or indirectly"; that "[t]he sole letter upon which Plaintiffs' counsel relies is a lawyer to lawyer communication stating that Dr. Gleason is a member of Medical Justice, which gives him access to $100,000.00 to fund lawful remedies if needed for false expert testimony provided against him"; that "[a] lawyer from Medical Justice that is not involved in this litigation and does not represent Defendants drafted this letter"; that "Plaintiffs' counsel has provided no evidence to support a claim that Defendants or Medical Justice made any contact with their alleged expert in this case"; that "[t]he

mirror image of Plaintiffs' argument is that a demand letter threatening litigation unless a settlement reached is extortion"; that "[t]he parties have rights and announcing that those rights will be acted upon is not impermissible"; that, "[i]f attorneys cannot communicate with each other without claims of witness intimidation, the litigation process will ironically be chilled"; and that "Defendants and Medical Justice have First Amendment rights to free speech when declaring legal remedies available to them," "[a]nd that is all they did here." *Id.* at 7 & n.2 (footnote omitted).

In support of their response, Defendant attach the Affidavits of Jeffrey Segal, MD, JD, and of Michael J. Sacopulos. *See* Dkt. Nos. 34-2 & 34-3.

Dr. Segal testifies under penalty of perjury in his July 16, 2015 affidavit that he is "the Founder and President of Medical Justice Services, Inc."; that Dr. Gleason "is a member of Medical Justice Services, Inc."; that "Medical Justice Services, Inc. and its agents have never contacted a plaintiff's witness in any pending medical malpractice action where a member is a defendant"; that "Medical Justice Services, Inc. and its agents did not contact any witness or potential witness in litigation involving P. Langham Gleason, MD"; that, "[u]ntil receiving a copy of Plaintiff's Motion for Sanction in litigation involving P. Langham Gleason, MD, Medical Justice Services, Inc. and its agents were unaware of the identity of any expert witness or potential expert witness retained by any party involved in litigation involving P. Langham Gleason, MD"; that "[n]o court or regulatory body has ever found that Medical Justice Services, Inc. intimidated or attempted to intimidate any witness"; and that "[a]t no time has Medical Justice Services, Inc. or its agents attempted to discourage honest,

accurate testimony or meritorious litigation." Dkt. No. 34-2 at 2 of 2.

Mr. Sacopulos testifies under penalty of perjury in his July 16, 2015 affidavit that he is "the general counsel of Medical Justice Services, Inc." and has "served as the general counsel of Medical Justice Services, Inc., since its creation more than ten (10) years ago"; that in his "capacity as general counsel of Medical Justice Services, Inc., [he] routinely send[s] correspondence to counsel involved in medical malpractice litigation"; that he has "never contacted a witness in any pending medical malpractice action involving a member of Medical Justice Services, Inc."; that "[t]he Medical Justice Services, Inc., is designed to fund lawful remedies in the event a witness testifies falsely or spurious claims are maintained against members of the organization"; that "[t]he system is not designed or used to influence legitimate litigation"; and that, "[u]ntil receiving a copy of Plaintiff's Motion for Sanction in litigation involving P. Langham Gleason, MD, [he] was unaware of the identity of any expert witness or potential expert witness retained by any party involved in litigation involving P. Langham Gleason, MD." Dkt. No. 34-3 at 2 of 2.

Plaintiffs reply that "Defendants' Response to the Motion for Sanctions is nonsensical and leaves the most critical question unanswered." Dkt. No. 35 at 1. Plaintiffs assert that, "[f]irst, Defendants ignore the fact that Medical Justice is an agent of Defendant Gleason, hired and paid by him for the 'benefits' that are described in the documents provided to the Court accompanying Plaintiff' Motion for Sanctions" and that, "[t]hus, their attempts to distance themselves from Medical Justice fall short," where, "[c]ertainly, Dr. Gleason did not distance himself from Medical Justice

when asked about it in his deposition." *Id.* Plaintiffs contend that, "[s]econd, [although Defendants] claim that the service is simply a 'post-litigation' review," "they ignore the fact that the letter was sent during litigation and not after." *Id.* And Plaintiffs argue that Defendants "have left this critical question unanswered: 'What possible legitimate purpose was served by sending the letter?' or restated: 'Other than intimidation of the parties and their witnesses, what purpose did the letter serve?'" *Id.* at 1-2. According to Plaintiffs, "[t]he fact that Dr. Gleason purchased the Medical Justice services was his personal business," and "they would certainly be in their rights to investigate behind the scenes and thereafter issues of malicious prosecution or what have you," "[b]ut, to threaten a party in ongoing federal court litigation with a message that 'we are coming after you with a $100,000-campaign if you don't drop this case or withdraw from it if the case doesn't go your way at trial!' is of a completely different nature." *Id.* at 2. Plaintiffs contend that Defendants' "claims that they simply want to encourage truthful testimony fall flat in the context of the Medical Justice materials before the Court and reminds one of the old latin maxim, '*merda taurorum animas conturbit.*'" *Id.* (As to this last rhetorical flourish just quoted, the Court advises counsel to refrain from resorting to profane phrases – in any language – in any oral or written presentation to the Court.)

Plaintiffs also ask the Court to imagine that "the letter was addressed to this Honorable Court rather than Plaintiffs, and stated that Defendants have a legitimate interest in proper use of judicial power, and they have put aside $100,000 to target any judge they think has abused his judicial power for the purpose of removing that judge

from the bench through judicial, legislative and any other means available" and to consider whether "the Court [would] think the letter was anything other than a threat to the Court." *Id.* at 2-3.

Plaintiffs finally contend that, "[a]t the end of the day, it is clear the defense, through their agents, have threatened the Plaintiffs and their witnesses in attempt to get them to drop their legitimate case (ie, the plaintiffs) or withdraw from providing the mandatory standard of care testimony necessary to support a medical malpractice case (ie, Dr. Hoekema)"; that "Defendants are smart enough to have crafted the language they use to walk a very thin line that is frankly specious, but in its actual use during litigation is obviously for the purpose of intimidation of parties and witnesses to drop legitimate lawsuits for fear of being ruined in the event of a trial loss, raising the already steep risks of medical malpractice litigation to an unacceptably high level for any plaintiff"; that "[t]his conduct threatens the very core of the civil justice system and the judicial branch"; and that "[t]he fact that the agent Defendants have used has gotten away with it for so long and the difficulty inherent in stopping this kind of offensive conduct speaks to the need for this Court to offer its strongest possible response." *Id.* at 4.

### Legal Standards

Plaintiffs invoke the Court's inherent powers or authority to impose sanctions. "A district court has the inherent authority to impose sanctions in order to control the litigation before it." *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010) (internal quotation marks omitted). This includes "the

power to levy sanctions in response to abusive litigation practices." *In re Stone*, 986 F.2d 898, 902 (5th Cir. 1993).

But these inherent powers "ought to be exercised with great caution" and are reserved for "conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 44-45 (1991) (internal quotation marks omitted). "The threshold for the use of the inherent power sanction is high." *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996).

Although "the inherent power extends to a full range of litigation abuses," the United States Supreme Court has cautioned that, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44, 46. The United States Court of Appeals for the Fifth Circuit has held that a sanction of involuntary dismissal with prejudice or a similar dispositive or so-called "death penalty" sanction "is a harsh sanction" and "should be confined to instances of 'bad faith or willful abuse of the judicial process.'" *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1417 (5th Cir. 1995).

## Analysis

Plaintiffs seek essentially dispositive sanctions against Defendants in this case and do so on what boils down to essentially two bases – an agent of a third-party organization of which Defendant Patrick Langham Gleason, M.D. is a member sent a letter to Plaintiffs' counsel in this case, and that organization provides a service to members, including Dr. Gleason, that Plaintiffs' counsel believes results in coercing parties and witnesses into changing or withholding testimony to dropping otherwise

meritorious claims for fear of financial catastrophe if the outcome is bad (including simply a loss at trial), such that the Court should impose severe sanctions to make an example out of Defendants and Medical Justice Services. Inc.

The Court declines the invitation to treat this case or the Court's inherent powers as a referendum or roving commission on the propriety of services that a third party offers to its members and finds that the facts presented here do not warrant or properly permit any such review or assessment of what Medical Justice Services, Inc. does generally or might do in connection with Plaintiffs' case in the future.

Rather, all that is before the Court at this time, in the Court's view, is whether Defendants should be sanctioned based on the February 17, 2015 letter sent by Michael Sacopulos to Plaintiffs' counsel.

The Court has carefully reviewed the letter and Dr. Gleason's testimony as well as Dr. Segal's and Mr. Sacopulos's affidavits concerning that letter. The evidence makes clear that the letter is not directed to any witness and does not mention any witness. Neither was the letter a communication directly to any of the Plaintiffs or any other represented party. Rather, it was a letter from one lawyer to another. It describes a service that Medical Justice Services, Inc. provides to members and advises Plaintiffs' counsel that Dr. Gleason is a member and subscriber to this service.

The evidence is clear that Mr. Sacopulos, in his capacity as the general counsel of Medical Justice Services, Inc., only sent the letter to Plaintiffs' counsel because Dr. Gleason is a member of Medical Justice Services, Inc. and because Plaintiffs' counsel represents plaintiffs suing Dr. Gleason in a case that Dr. Gleason "factual[ly]

report[ed]" to Medical Justice Services, Inc. But the letter does not characterize this lawsuit or any testimony being offered in it as nonmeritorious, frivolous, deceptive, or false or threaten or promise that Medical Justice Services, Inc. will in fact bring or fund any action based on this case after it is concluded. And Dr. Gleason's testimony is also clear that he was not aware of the letter's being sent to Plaintiffs' counsel and apparently was not even aware that Mr. Sacopulos or any other agent of Medical Justice Services, Inc. would routinely send such a letter to a lawyer representing a plaintiff suing a member of Medical Justice Services, Inc. As such, that Dr. Gleason may believe that Plaintiffs' claims against him are nonmeritorious and even frivolous is neither surprising nor germane to assessing the significance of Mr. Sacopulos's letter to this case.

After carefully considering the record before the Court, the Court finds no evidence that Defendants have engaged in any abusive litigation tactics or acted in bad faith. Whatever purpose Mr. Sacopulos hopes to accomplish by sending such a letter, and without further opining on the propriety of such a practice by this third-party organization, the Court finds that Mr. Sacopulos's letter to Plaintiffs' counsel and Dr. Gleason's admitted membership-based subscription to Medical Justice Services, Inc.'s services do not amount to any witness or party intimidation that should be attributed to Defendants and result in any sanctions against them.

## Conclusion

Plaintiffs' Motion for Sanctions for Witness/Party Intimidation [Dkt. No. 31] is DENIED.

SO ORDERED.

DATED: September 16, 2015

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE